In the

# United States Court of Appeals
## For the Seventh Circuit

No. 07-3618

GREGG L. DUCKWORTH,

*Plaintiff-Appellant,*

*v.*

MAHER K. AHMAD AND FRANCIS KAYIRA,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 02-CV-381—**David R. Herndon**, *Chief Judge.*

ARGUED APRIL 10, 2008—DECIDED JULY 14, 2008

Before FLAUM, KANNE, and EVANS, *Circuit Judges.*

FLAUM, *Circuit Judge.* Gregg L. Duckworth is an inmate in the Centralia Correctional Facility in southern Illinois and, sadly, in early 2001 a doctor diagnosed him with bladder cancer. This diagnosis came after sixteen months of treatment for gross hematuria—a condition that involves the emission of blood in the urine—by two different doctors, Maher K. Ahmad and Francis Kayira. After his diagnosis, Duckworth filed this suit under 42 U.S.C. § 1983, alleging that both doctors were deliberately indifferent to his serious medical needs and thus

violated his Eighth Amendment rights. The parties con-
sented to proceed before a magistrate and, after discovery,
the judge recommended granting Dr. Ahmad's motion
for summary judgment and denying Dr. Kayira's. The
district court adopted the magistrate's recommendation as
to Dr. Ahmad but vacated the magistrate's recommenda-
tion as to Dr. Kayira, instead entering summary judg-
ment in his favor as well. Duckworth appealed and, for
the reasons set out below, we affirm.

## I. Background

This case turns on the treatment afforded Duckworth
from August 1999 through December 2000. During this
period, Duckworth had two stints in two prisons, the
Champaign County Jail and the Centralia Correctional
Facility, where, as is relevant here, he saw first Dr. Ahmad
and then Dr. Kayira respectively. Duckworth first visited
Dr. Ahmad in August 1999 and complained of blood in his
urine, a condition called gross hematuria. Dr. Ahmad
diagnosed Duckworth with "painless hematuria" and
conducted a urinalysis, which did not reveal an infection.
The doctor then referred Duckworth to a urologist at the
Christie Clinic, a nearby group medical practice. But rather
than being taken to the urologist, Duckworth went (for
reasons unknown) to a general practitioner, Dr. James
Blatzer. Dr. Blatzer's tests—including a "mid-stream catch"
of his urine—did not indicate the presence of blood. And
so Duckworth was discharged with the instructions to
return if he saw any blood in his urine in the future.

Over the next few months, Duckworth would go to see
Dr. Ahmad four more times, and for three of these visits,
Dr. Ahmad labored under the erroneous belief that

Duckworth was still receiving treatment at the Christie Clinic. During his next two visits, in October and November 1999, Duckworth did not complain of blood in his urine although a urinalysis conducted during one of these trips revealed trace amounts of blood. And during one of these appointments Duckworth told Dr. Ahmad that he was being treated by a urologist, which was in line with Dr. Ahmad's assumptions.

His final visit came in February 2000. Duckworth complained of blood in his urine and told Dr. Ahmad that he was not, in fact, seeing a urologist. As a result, Dr. Ahmad ordered a number of tests including an intravenous pyelogram or IVP, which is an x-ray of the kidneys and urinary tract. Duckworth testified that prior to this test Dr. Ahmad had told him that "if this comes back clear, I don't want to hear no more out of you." These x-rays did come back clear, and Dr. Ahmad never did treat Duckworth again. Duckworth claims that he tried to receive treatment from Dr. Ahmad a few more times in February 2000 but nurses refused per Dr. Ahmad's orders. Dr. Ahmad claims that he never heard of any request for treatment, but he agrees that he did not treat Duckworth after February 2000.

In July 2000, Illinois prison officials transferred Duckworth to the Centralia Correctional Facility, a medium-security prison seventy miles east of St. Louis. There, Duckworth sought treatment from Dr. Kayira. His first visit was in June 2000 when, once again, Duckworth complained of blood in his urine. During this initial visit, Duckworth told Dr. Kayira about his ten months of hematuria, the ineffectiveness of his four months of treatment, and his fears that he had cancer based on his family's history with the disease. In response, Dr. Kayira

ordered a urinalysis, prescribed a painkiller, and requested Duckworth's medical records from the Champaign County Jail. In addition, Dr. Kayira sought to quiet Duckworth's cancer fears. A month later, Duckworth again sought treatment for hematuria. The tests did not indicate that there was blood in the urine, but it did return a high white blood cell count and bacteria. Believing that this was a recurrent urinary tract infection, Dr. Kayira ordered a "clean catch midstream" and a "culture and sensitivity" test. The results from this test indicated some type of infection, and so Dr. Kayira prescribed antibiotics in an effort to clear it up.

In September 2000, Duckworth complained to a nurse about stomach pains and continued hematuria. When he learned of this, Dr. Kayira ordered a urinalysis and a KUB test—so named as an acronym for kidneys, urinary, and bowels. The urinalysis did not indicate the presence of any blood, but Duckworth did have a slightly high red-blood-cell count, a much higher white-blood-cell count, and a moderate level of bacteria. The KUB test revealed calcific densities or calcium deposits that can indicate the presence of stones in the urinary tract. Based on all this, Dr. Kayira suspected that Duckworth had kidney stones and prescribed a course of antibiotics to treat them. Soon afterwards, Dr. Kayira also requested the results of the IVP that Dr. Ahmad had conducted months earlier. Over the coming months, Duckworth's condition was little improved. After Duckworth complained of stomach pain in October 2000, Dr. Kayira requested a second IVP, which indicated the presence of a bladder stone. In November 2000, Duckworth saw Dr. Kayira again, and a urinalysis revealed an abnormal amount of blood in the urine, high red and white blood cells, and moderate level of bacteria.

Finally, in December 2000, Duckworth complained to Dr. Kayira of pain in his back and abdomen. Dr. Kayira recommended painkillers and referred Duckworth to a urologist, Dr. Manoj H. Desai. Dr. Desai conducted a series of diagnostic tests in December and early January, including a cystoscopy. This last test revealed a cancerous tumor in Duckworth's bladder. Although it is unclear what treatment followed, Duckworth eventually filed this lawsuit against Drs. Ahmad and Kayira. After discovery and cross-motions for summary judgment, a magistrate judge recommended granting Dr. Ahmad's motion and denying Dr. Kayira's. The district court then adopted the recommendation as to Dr. Ahmad and rejected it as to Dr. Kayira, reasoning that his course of treatment did not rise to the level of objective indifference. This appeal followed.

## II. Discussion

As he did below, Duckworth argues on appeal that both Drs. Ahmad and Kayira were deliberately indifferent to his gross hematuria. We review de novo the district court's decision to grant the defendants summary judgment on these claims. And, because Duckworth lost below, we reasonably construe the facts in his favor. *Greeno v. Daley*, 414 F.3d 645, 648-49 (7th Cir. 2005).

The states have an affirmative duty to provide medical care to their inmates. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). And the upshot of this duty is that the "deliberate indifference to [the] serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain'" and violates the Eighth Amendment's prohibition against cruel and unusual punishments. *Id.* at 104. To

state a cause of action, a plaintiff must show (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent. *Sherrod v. Lingle*, 223 F.3d 605, 610 (7th Cir. 2000). Deliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts. *Id.* And although deliberate means more than negligent, it is something less than purposeful. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). The point between these two poles lies where "the official knows of and disregards an excessive risk to inmate health or safety" or where "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he . . . draw[s] the inference." *Id.* at 837. A jury can "infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006).

All the parties agree that gross hematuria is an objectively serious medical condition. But Duckworth argues and the defendants deny that the medical treatment afforded him shows deliberate indifference. The short of his argument is that either doctor should have ordered a cystoscopy as soon as he learned that Duckworth was passing blood in his urine. In turn, he claims that the failure to do so, coupled with the additional facts laid out below, proves their deliberate indifference. The following sections discuss each claim in turn.

**A. Dr. Ahmad**

Duckworth claims that the Dr. Ahmad's treatment while he was housed in the Champaign County Jail evinced deliberate indifference.[1] Specifically, Duckworth argues that Dr. Ahmad had notice of his serious condition after he first treated him. Despite having knowledge of this condition, Dr. Ahmad failed to take the medically necessary steps to treat him. That is, the doctor should have ordered a battery of tests, including a cystoscopy, once he learned of the hematuria, rather than refer him out to the Christie Clinic and administer an IVP and urinalyses. Duckworth also points to Dr. Ahmad's questionable bedside manner when administering the IVP, specifically his statement that "if this comes back clear, I don't want to hear no more out of you." Lastly, he claims that Dr. Ahmad remained indifferent to his repeated requests for medical treatment in the months leading up to his departure from the Champaign County Jail.

It is regrettable, as Duckworth suggests, that no doctor conducted a cystoscopy earlier than January 2001. With the benefit of hindsight, it may have been a better route for Dr. Ahmad to immediately conduct one after diagnosing him with gross hematuria. And Dr. Ahmad's alleged statement that he did not want to "hear no more out of" Duckworth after the IVP would, if true, be far from empathic. But the most that the evidence establishes is that Dr. Ahmad placed too much faith in having referred Duckworth out to the Christie Clinic. Showing deliberate indifference requires more.

---

[1] The parties also dispute whether Dr. Ahmad was a state actor. It is unnecessary to reach this issue as, even assuming that he was, Dr. Ahmad was not deliberately indifferent.

Before a doctor will be found deliberately indifferent, the plaintiff must show subjective indifference. *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000). The nub of this subjective inquiry is what risk the medical staff knew of and whether the course of treatment was so far afield as to allow a jury to infer deliberate indifference. *See Edwards v. Snyder*, 478 F.3d 827, 830-31 (7th Cir. 2007) ("The subjective component of a deliberate indifference claim requires that the prison official knew of 'a substantial risk of harm to the inmate and disregarded the risk.' ") (citing *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). Here, Duckworth has failed to show that Dr. Ahmad knew at all that the hematuria involved an excessive risk of cancer. *Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). Dr. Ahmad thought Duckworth was seeing a urologist. He labored under this misunderstanding for Duckworth's next three visits, and Duckworth even confirmed this during one visit. Then, when Duckworth disabused him of the idea, Dr. Ahmad conducted additional testing—including urinalysis and an IVP—to determine the cause of Duckworth's hematuria. No evidence shows that Dr. Ahmad suspected cancer or actually "dr[e]w the inference" that Duckworth's symptoms posed a serious medical risk.

Nor has Duckworth presented evidence that his chosen treatment was "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). When Dr. Ahmad first learned of Duckworth's symptoms, he referred him to a specialist. And after he learned that Duckworth was not

seeing a specialist, he conducted tests—an IVP and a urinalysis—to investigate further. Neither test revealed blood in Duckworth's urine. And so Dr. Ahmad's decision to forgo a more aggressive treatment plan cannot raise an inference of deliberate indifference. Perhaps it would have been prudent for Dr. Ahmad to immediately order a cystoscopy. But the evidence adduced below does not indicate that he was deliberately indifferent in failing to do so. Accordingly, the district court properly granted him summary judgment.

### B. Dr. Kayira

Duckworth raises a similar claim against Dr. Kayira. He claims that Dr. Kayira knew of the obvious risk of cancer from gross hematuria yet pursued an alternate course of treatment. In addition, he soldiered on with this course of treatment even in the face of evidence suggesting it was not working. Dr. Kayira even told Duckworth that he did not have cancer after hearing of Duckworth's family history with the disease. Finally, as with Dr. Ahmad, Duckworth claims that Dr. Kayira should have immediately ordered a cystoscopy when he complained of his hematuria and told Dr. Kayira of his family's history of cancer.

Unlike Dr. Ahmad—who did not know that cancer may be the cause of the hematuria—Dr. Kayira was aware that cancer was a risk but erroneously thought that another condition was more likely causing Duckworth's symptoms. The question then becomes whether this distinction requires a different result, and we do not think it does. The evidence below shows a pattern of behavior: Dr. Kayira would order tests; these tests would provide evidence

of some other condition besides cancer; and Dr. Kayira would treat that condition. For example, the testing after the first visit indicated a high white blood cell count and bacteria. A "clean catch midstream" and a "culture and sensitivity" test revealed some sort of infection. Dr. Kayira thought that Duckworth had a recurrent urinary tract infection and prescribed antibiotics in an effort to clear it up. A second urinalysis similarly revealed a high white blood cell count and a moderate level of bacteria, and an accompanying KUB test showed calcific densities in Duckworth's urinary tract. Dr. Kayira thought Duckworth had kidney stones and prescribed a course of antibiotics. Another IVP revealed a bladder stone, which Dr. Kayira took as confirmation that his course of treatment was appropriate.

This evidence justifies summary judgment in Dr. Kayira's favor because there is no evidence that Kayira knew of and disregarded the risk of cancer even if he was aware that it was a possibility. Duckworth points to the expert testimony of an experienced urologist stating that cancer should always be ruled out first before other conditions when a patient has gross hematuria. This may be a fair statement of how a reasonable doctor would treat Duckworth's symptoms, but it does not shed any light into Dr. Kayira's state of mind. Nor did Dr. Kayira's chosen course of treatment so depart from accepted professional practice as to allow the jury to infer indifference. Dr. Kayira tried to cure what he thought was wrong with Duckworth, an opinion he arrived at using medical judgment. In addition, Duckworth points to Dr. Kayira's statement assuring him that he did not have cancer during his first visit. If anything, this assurance only indicates that Dr. Kayira did not think that Duckworth had cancer. As was the case with Dr. Ahmad, it may

have been prudent for Dr. Kayira to rule cancer out first. But this is just to reiterate the standard for medical malpractice, which falls short of deliberate indifference.

These facts differentiate this case from those in *Greeno v. Daley*, 414 F.3d 645 (7th Cir. 2005), a case that the magistrate cited when denying Dr. Kayira's motion for summary judgment. There, the inmate suffered from severe heartburn and vomiting. After visiting a prison doctor, the doctor made notes on two separate occasions to rule out a chronic peptic ulcer and gastro-esophageal reflux disease, something that the doctor never did. Instead, medical staff prescribed several medications to treat his heartburn and antacids for his vomiting. This treatment actually made Greeno's condition worse, a fact Greeno communicated to his doctors. In addition to this ineffective course of treatment, at some point medical personnel denied him treatment altogether. After months of ineffective treatment, a specialist eventually tested him for an esophageal ulcer. The tests came back positive for a distal ulcer, which Greeno finally had treated. To compound matters, the months of taking antacids had caused damage to Greeno's colon and bowels.

We held that this evidence was sufficient to show the medical staff treating Greeno was subjectively indifferent to his serious medical condition. Central to our holding were the facts that "[t]he possibility of an ulcer was first noted in Greeno's chart in August 1995" after which "the defendants doggedly persisted in a course of treatment known to be ineffective." *Id.* at 655. The evidence was overwhelming that the course of treatment was not effective; Greeno repeatedly complained of worsening symptoms to medical staff over the course of a year. Despite this evidence, the medical staff became increasingly

frustrated with Greeno's requests for treatment, refused to alter his treatment when the condition became worse, and even denied him further medication at one point.

Duckworth cannot make a similar claim. In the first place, there is no evidence, as in *Greeno*, that Dr. Kayira thought that cancer was a realistic possibility. Nor were Duckworth's symptoms obviously attributable to cancer. The *Greeno* doctors, on the other hand, were presented with a patient who, over the course of three years, complained of severe heartburn and uncontrollable vomiting. After the initial two visits, the doctors indicated the need to rule out the ultimate condition that afflicted Greeno. Despite these notes, they persisted in a course of treatment that obviously did not work—even though a lay person could surmise that continuing to treat severe vomiting with antacids over three years was not a sound medical approach. The evidence here indicates that unlike the medical staff in *Greeno*, Dr. Kayira did not think Duckworth's condition was anything more serious than a urinary tract infection. These are the kinds of medical assessments doctors can make without running afoul of the Constitution.

In addition, the course of treatment was not obviously ineffective as in *Greeno*. Dr. Kayira responded to Duckworth's continued complaints in a manner calculated to treat him. *See Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996) ("What we have here is not deliberate indifference to a serious medical need, but a deliberate decision by a doctor to treat a medical need in a particular manner."). The initial testing done by Dr. Kayira did not indicate an abnormal amount of blood in the urine. When Duckworth's hematuria worsened, Dr. Kayira responded with more advanced testing. When the initial

antibiotics treatment did not work, Dr. Kayira ordered a KUB test. And when his treatment based on the results of the KUB test did not work, he administered an IVP, which indicated a bladder stone. This was followed a month later by another urinalysis, and a month after that Dr. Kayira referred Duckworth to a specialist, who then discovered his cancer. This is not such "a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261-62 (7th Cir. 1996). Dr. Kayira's hypotheses were that Duckworth suffered from kidney stones or a urinary tract infection. And based on these hypotheses, he pursued a course of treatment. This is a far cry from that followed in *Greeno* where the doctors made no effort to determine what was wrong with the plaintiff. In short, there is no evidence that Dr. Kayira knew of and disregarded the risk of cancer and, as a result, the district court was correct to enter summary judgment in his favor.

## III. Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of both Drs. Ahmad and Kayira.